## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SAMUEL NOAH ELLISON, et al.**<br>    *Plaintiffs,*<br><br>**v.**<br><br>**SMITHKLINE BEECHAM**<br>**CORPORATION d/b/a**<br>**GLAXOSMITHKLINE,**<br>    *Defendant.* | **CIVIL ACTION NO. 11-2823** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION TO REMAND

Plaintiffs timely file this Motion to Remand and Memorandum in Support[1] and request that this Court remand this case to the Court of Common Pleas, Philadelphia County, Pennsylvania, and respectfully submit the following.

## INTRODUCTION

Defendant has removed twenty-one Paxil pharmaceutical liability cases were children were born with birth defects following their mothers' ingestion of Paxil during pregnancy.[2]

In these twenty-one cases, Plaintiffs filed and served Plaintiffs' Civil Action Short-Form Complaints for Paxil Pregnancy Cases notifying Defendant named in the actions on or about March 28, 2011 and March 29, 2011.[3]  On April 6, 2011 and April 7, 2011 GSK and related entities noticed appearances in the cases.  The Defendant entities were served with all relevant pleadings.

---

[1]    Exhibits in Plaintiffs' Memorandum which are subject to the Protective Order in the Philadelphia Court of Common Pleas are not being sent to the Clerk in a sealed envelope or courtesy copy to Your Honor until this Court has the opportunity to consider Plaintiffs' Unopposed Motion to File Under Seal being filed simultaneously herewith.  Once such Motion is granted, Plaintiffs will send sealed exhibits to the Court.

[2]    Despite Defendant simultaneously removing twenty-one Paxil cases, Defendant answered "N/A" for Section VIII regarding Related Case(s) on the Civil Cover Sheet of all 21cases which prompted these twenty-one cases to be assigned to 17 federal court judges.

[3]    Plaintiffs have not attached the complaints, summons and proof of service but will produce these documents if the Court so requests.

Despite GSK's corporate machinations as evidenced by the mergers, dissolutions, and conversions outlined in its removal, Plaintiffs assert the Motion to Remand is both timely and proper.  As evidenced herein, no matter how they try to spin it, GSK and other related entities operate with a principal place of business in Philadelphia, Pennsylvania.[4] GSK violates the equitable principles set forth in *Hertz* by gerrymandering jurisdiction and attempting to evade and manipulate the jurisdiction of the very courts where GSK centrally operates.

## SUMMARY OF MOTION

The Court's ultimate decision as to whether subject matter jurisdiction exists in these cases (arguably) involves the "citizenship" of one of the following entities:

> Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK"), a Pennsylvania corporation based in Philadelphia, the corporate form of which (*only*) GSK executives terminated in October 2009, creating in its place a Delaware limited liability company—GlaxoSmithKline LLC ("GSK LLC")—whose principal place of business (including the center of all United States operations) remains in Philadelphia; or

> GlaxoSmithKline Holdings (Americas), Inc. ("GSK Holdings"), an empty corporate shell with no headquarters or other "nerve center" that satisfies the United States Supreme Court's recently established test for business entity citizenship under *Hertz Corp. v. Friend*, which was GSK's sole shareholder during GSK's corporate existence and continues as GSK LLC's sole "member" now.[5]

GSK contends that this Court must look to the citizenship of GSK Holdings, a Delaware corporation, and find that there is a diversity of citizenship between the parties that supports federal subject matter jurisdiction.  GSK is wrong for at least four reasons.

*First,* as of the date of filing, GSK was an active, domestic  corporation with its principal place of business in Philadelphia according to the Pennsylvania Department of State, and a

---

[4]     These facts are fleshed out in other GSK removal discovery and incorporated herein.
[5]     130 S. Ct. 1181 (2010).

Pennsylvania citizen for Jurisdictional purposes, making removal improper under 28 U.S.C. §1441(b).[6]

*Second*, under the *Hertz* "nerve center" test, GSK LLC's principal place of business is (still) in Philadelphia, Pennsylvania (just as GSK's was), notwithstanding the change of business entity form.

*Third*, GSK LLC's sole member, GSK Holdings, has no corporate headquarters or "nerve center" in Delaware at all, but instead borrows a mailing address from a local bank that it shares with hundreds if not thousands of other unrelated business entities.  This fact, accompanied by overwhelming, similar evidence described herein, indicates the Court must find the real "nerve center" of GSK's United States business activities is in Philadelphia.  At a minimum, GSK fails to meet its burden to prove diversity of citizenship as it cannot credibly show that GSK Holdings' "nerve center" is in Delaware.  Additionally, GSK's recent efforts to establish a Delaware-based "nerve center" are illusory and undermine its position.

*Lastly*, if the Court finds that GSK is a dissolved Pennsylvania corporation, as a dissolved Pennsylvania corporation it  remains subject to suit in Pennsylvania until two years after the date of dissolution (October 27, 2011), and GSK is a real party in interest to this lawsuit that defeats diversity jurisdiction.  For all those reasons, the Court should remand this case to the Pennsylvania Court of Common Pleas.

### FACTUAL AND PROCEDURAL HISTORY

Notwithstanding the substantial history of pharmaceutical litigation in Pennsylvania state courts,[7] GSK removed other state court pharmaceutical cases from Pennsylvania courts on or

---

[6]     *See* printout from Pennsylvania Department of State, Corporate Business Entity Filing History dated March 28, 2011, Ex. 1.  *See also Brewer v. SmithKline Beecham* Memorandum Opinion describing GSK "as a Pennsylvania citizen for jurisdictional purposes" Ex. 2.

about May 2010.[8]  Like the purported reason for removal in the present cases, GSK alleged that its "conversion" from a Pennsylvania corporation headquartered in Philadelphia to GSK LLC, a Delaware entity headquartered—still—in Philadelphia, rendered the parties completely diverse for purposes of establishing federal diversity jurisdiction.[9]

The principal dispute regarding the propriety of removal here centers on how this Court applies the *Hertz* "nerve center" test to the remarkable jurisdictional facts underlying these cases—i.e., wherein GSK admits that GSK LLC's principal place of business is in Philadelphia and the relevant evidence conclusively supports that admission.  If the Court finds, as GSK suggests, the "nerve center" test only applies to corporations and not LLCs—and the Court should *not* adopt that position—then GSK nevertheless fails to meet its burden to prove that GSK Holdings presence in Delaware satisfies *Hertz*.  In fact, a review of the relevant "citizenship" facts surrounding GSK, GSK LLC, and GSK Holdings, as outlined in *Brewer*, leaves little doubt that GSK's claim of Delaware citizenship is merely an "attempt[] at [jurisdictional] manipulation," which *Hertz* proscribes.[10]

### GSK LLC Was Formed by a GSK Holdings' Officer Acting in Pennsylvania.

The termination of GSK's existence as a Pennsylvania corporation and its emergence as a Delaware limited liability company occurred on October 27, 2009.  On that date, Michael

---

[7]     Plaintiffs are among thousands of claimants in the last several years alleging that in utero ingestion of GSK's prescriptions caused adverse events and/or death, and that GSK knew of those risks but failed to warn about them.  The majority of cases were filed against SmithKline Beecham Corporation d/b/a GlaxoSmithKline in Philadelphia, Pennsylvania Court of Common Pleas and preceded to trial or settlement.  Throughout the years of these litigations it was undisputed that GSK was headquartered in center city Philadelphia and its sole shareholder was GSK Holdings. (*In re Paxil Suicide, In re Paxil Birth Defect, In re Avandia, In re Denture Cream* to name a few).

[8]     *See, e.g., Monroe v. SmithKline Beecham Corp.*, No. 10-cv-02140, 2010 U.S. Dist. LEXIS 63626, at *3 (E.D. Pa. June 25, 2010), *vacated on other grounds*, No. 2:10-cv-02140-JCJ, slip op., (E.D. Pa. July 20, 2010).

[9]     *See, e.g., id.* at *2-3, 6-8; *White v. SmithKline Beecham Corp.*, No. 10-2141, 2010 U.S. Dist. LEXIS 79520, at *3-7 (E.D. Pa. Aug. 6, 2010).

[10]     130 S. Ct. at 1195.

Corrigan, who was and is both GSK's and GSK LLC's senior vice president of finance, as well as a GSK Holdings' director and its vice president[11]—who has at all relevant times officed at GSK's headquarters in center city Philadelphia[12]—sat in his Philadelphia office and signed legal documents on GSK Holdings' behalf attempting to terminate GSK's corporate form and creating GSK LLC in its place.[13]   Notwithstanding the significance of this change, GSK Holdings' board of directors did not hold a meeting in Wilmington, Delaware or anywhere else prior to the signing, although Mr. Corrigan conferred informally by telephone with GSK Holdings' president, Julian Heslop, in London before the documents' execution.[14]

### GSK LLC Carried On Business as Usual in Pennsylvania Following LLC Creation.

According to Mr. Heslop, who also serves as the chief financial officer of GSK Holdings' parent, GlaxoSmithKline PLC, GSK changed its business entity form from a Pennsylvania corporation to a Delaware LLC for tax reasons and not to avoid jurisdiction in Pennsylvania state courts.[15]   Notwithstanding the entity change, the officers of the company intended to "carry on business as we had carried on business before,"[16] including having the same obligations and *being "sued in exactly the same way."*[17]   GSK maintained its headquarters—some 30 floors of center city office space[18]—and the direction and control of its United States pharmaceutical operations in Philadelphia, Pennsylvania, as always, albeit now operating as GSK LLC.[19]   GSK LLC's formation agreement, executed by Mr. Corrigan in Philadelphia, states that "the business

---

[11]    Michael Corrigan Deposition ("Corrigan Dep.) at 10-12 (Ex. 3).
[12]    *Id.* at 42.  (Ex. 3).
[13]    *Id.* at 58-65 (Ex. 3).
[14]    *Id.* (Ex. 3).
[15]    Julian Heslop Declaration ("Heslop Decl.") ¶ 6 (Ex. 4); Julian Heslop Deposition ("Heslop Dep.") at 201-201 (Ex. 5).
[16]    Heslop Dep. at 202 (Ex. 5).
[17]    *Id.* at 145 (emphasis added) (Ex. 5).
[18]    Heslop Dep. at 29 (Ex. 5).
[19]    *Id.* at 15, 18, 23-26, 47, 107 (Ex. 5).

address of the company is 1 Franklin Plaza, Philadelphia, Pennsylvania . . . ."[20]  GSK intended

for its executive committee members to continue their service as initial members of GSK LLC's

executive committee.[21]   The majority of GSK's senior officers with permanent offices in

Philadelphia continued to work in Philadelphia after GSK terminated its corporate existence and

became GSK LLC.[22]  None of those officers relocated their offices to Delaware.[23]  As noted, Mr.

Corrigan offices in Philadelphia.[24]  GSK Holdings' assistant treasurer, Jan Lyons, who is also

GSK LLC's U.S. tax director, also has her permanent office in Philadelphia and oversees a "big

team" of 20-25 GSK LLC employees in Philadelphia.[25]

Additionally, on March 1, 2010, GlaxoSmithKline PLC, GSK LLC's ultimate parent

company, filed its annual report for the year ending December 31, 2009 and identified its center

city Philadelphia office as GSK LLC's "headquarters."   Specifically, the annual report

revealed:[26]

**43 Principal Group companies**

The following represent the principal subsidiary and associated undertakings of the GlaxoSmithKline Group at 31st December 2009.
Details are given of the principal country of operation, the location of the headquarters, the business sector and the business activities.
The equity share capital of these undertakings is wholly owned by the Group except where its percentage interest is shown otherwise. All
companies are incorporated in their principal country of operation except where stated.

**USA**

| USA | | | | | |
|-----|------|--------------------------------------------|--------|-------------|----|
| | Coral Gables | Stiefel Laboratories, Inc. | Ph | h m p | |
| | Hamilton | Corixa Corporation | Ph | m p | |
| | Philadelphia | GlaxoSmithKline LLC | Ph,CH | d e h m p r s | |
| | Pittsburgh | GlaxoSmithKline Consumer Healthcare, L.P. | CH | m p | 88 |
| | Pittsburgh | Block Drug Company, Inc. | CH | h m | |
| | Wilmington | GlaxoSmithKline Holdings (Americas) Inc. | Ph,CH | h | |
| | Wilmington | GlaxoSmithKline Capital Inc. | Ph | f | |
| | Cambridge | Sirtris Pharmaceuticals Inc. | Ph | r | |
| | Research Triangle Park | ViiV Healthcare Company | Ph | m | 85 |

---

[20]     Heslop Dep. at 49-52 (Ex. 5).
[21]     Heslop Dep. at 54 (Ex. 5).
[22]     *Id.* at 24-25 (Ex. 5).
[23]     *Id.* at 24 (Ex. 5).
[24]     Corrigan Dep. at 42 (Ex. 3); Heslop Decl. ¶¶ 20-21 (Ex. 4); Heslop Dep. at 50 (Ex. 5).
[25]     Heslop Decl. ¶ 21 (Ex. 4); Heslop Dep. at 26-27, 63-65 (Ex. 5).
[26]     *Annual Report 2009* at 166-68, *available at* http://www.gsk.com/investors/reps09/GSK-Report-2009-full.pdf.  GSK PLC's 2010 Annual Report, available at http://www.gsk.com/invesetors/reps10/GSK-Annual-Report-2010.pdf is substantially similar listing GlaxoSmithKline LLC's location as Philadelphia, with activity including development, exporting, holding company, marketing, production, research and service.  *Id.* at 177-178.

Key
Business sector:      Ph Pharmaceuticals, CH Consumer Healthcare
Business activity:    d development, e exporting, f finance, h holding company, i insurance, m marketing, p production, r research,
                      s service

As shown above, Philadelphia is the only GSK "pharmaceutical" and "consumer healthcare" business-sector location in the United States directing, controlling, and coordinating nearly *all* of GSK's United States business activities, including development, exporting, marketing, production, research, and service.   (In contrast, GSK Holdings, discussed below, is only identified as a "holding company" in the table above.)[27]  Not surprisingly, GSK LLC also holds itself out to the public as "located in Center City Philadelphia" at its Franklin Plaza offices, which "houses [GSK's] marketing, communications, finance, IT, HR, sales, administration, and other corporate functions."[28]

Andrew Witty, GSK's Chief Executive Officer, and Dan Troy, GSK's Senior Vice President and General Counsel, also office at the Franklin Plaza facility in center city Philadelphia.[29]  The company's "top officers" direct the above-described activities from the principal place of business in Philadelphia.[30]

GSK LLC (as well as GSK) also acknowledged that its principal place of business is Philadelphia, Pennsylvania in recent court filings.  In 2010, in *Glaxo Group Ltd. v. Genentech, Inc.*, GSK filed a patent dispute lawsuit against another drug manufacturer and stated in the Complaint: "Plaintiff GlaxoSmithKline LLC is a Delaware limited liability company having a

---

[27]      This 2010 Report mimics this claim.
[28]      Locations, US.GSK.com, http://us.gsk.com/html/career/career-working-locations.html (last visited May 2, 2011) (Ex. 6).
[29]      Andrew Witty, GSK.com, http://www.gsk.com/about/bio-witty-cet.htm (last visited May 2, 2011) (Ex. 7); Dan Troy, GSK.com, http://www.gsk.com/about/bio-troy-cet.htm (last visited May 2, 2011) (Ex. 8).
[30]      *See Hertz*, 130 S. Ct. at 1044 (explaining that notwithstanding where "the bulk of the company's business activities visible to the public take place," if "its top officers direct those activities . . . in [,] [for example,] New York, the 'principal place of business' is New York"); *see also* discussion, *infra* at 8-12.

principal place of business at One Franklin Plaza, Philadelphia, Pennsylvania[] 19102."[31]   And, in its May 14, 2010 answer to a patent infringement lawsuit against GSK LLC brought by Biogen Idec, Inc., GSK LLC admitted that "GlaxoSmithKline LLC is a Delaware limited liability company having a principal place of business at One Franklin Plaza, Philadelphia, Pennsylvania[] 19102."[32]   On May 24, 2010, in answer to a personal injury complaint filed in *Woodson-Gatson v. SmithKlineBeecham Corp.*, GSK affirmed that "SmithKlineBeecham Corporation is a Pennsylvania Corporation with its principal place of business in Philadelphia, Pennsylvania."[33]

Lastly, in at least one consolidated pharmaceutical litigation in the Pennsylvania Court of Common Pleas, GSK's master answer admits its principal place of business is in Philadelphia, Pennsylvania.[34]

In sum, *as Mr. Heslop testified, GSK LLC's principal place of business is, unequivocally, Philadelphia, Pennsylvania*:

> Q.   The people who direct and control the GlaxoSmithKline business, the pharmaceutical business and the consumer healthcare business in the United States still work and reside in Philadelphia.  Correct?
>
> *   *   *
>
> A.   The LLC people still work in Philadelphia, yes, no change.
>
> Q.   And that is the principal place of business of GlaxoSmithKline LLC, is it not?
>
> A.   Yes, it is. [35]

---

[31]   Pls.' Compl. Declaratory J. of Invalidity, Unenforceability, and Infringement, *Glaxo Group Ltd. v. Genentech, Inc.*, No. CV-10-675, at 2 (N.D. Cal. Feb. 17, 2010) (Ex. 9).

[32]   Defs.' Answer, *Biogen Idec., Inc. v. GlaxoSmithKline LLC*, No. 10-CV-0608 BEN (WVG), at 2 (S.D. Cal. May 14, 2010) (Ex. 10).

[33]   Defs.' Answer to Pls.' Am. Compl., *Woodson-Gatson v. SmithKline Beecham Corp.*, No. 10-CV-1011 ENV, at 2 (E.D.N.Y. May 24, 2010) (Ex. 11).

[34]   Def.'s Answer at 2.  (*In re Paxil,* Ex.12).

## GSK Holdings Has No "Nerve Center" in Delaware.

In contrast, GSK Holdings has no day-to-day physical presence—much less "offices and headquarters"[36]—in Wilmington, Delaware, where GSK claims GSK Holdings has its principal place of business.  GSK Holdings has "zero" employees.[37]  Most of the representatives who are authorized to act on GSK Holdings' behalf are GSK LLC employees working in Philadelphia.[38]  GSK Holdings' president Heslop is unaware of any bank accounts or ability to receive funds in Delaware; he believes that function is accomplished by GSK LLC's treasury department in Philadelphia.[39]  Further, Ms. Lyons and her team of tax accountants prepare the consolidated U.S. tax returns for GSK Holdings in Philadelphia.[40]

Additionally, GSK Holdings' registered address in Delaware is actually the office of a downtown Wilmington, Delaware bank (Wilmington Trust); GSK Holdings conducts some of its quarterly board meetings and attendant "functions" in a Wilmington Trust conference room.[41]  Several hundred if not thousands of other businesses—wholly unrelated to GSK—share the same Wilmington Trust business address (1105 North Market Street, Suite 1300, Wilmington, Delaware 19801) with GSK Holdings.[42]  Neither GSK LLC nor GSK Holdings has any office

---

[35]    Heslop Dep. at 107 (Ex. 5).

[36]    *White*, 2010 U.S. Dist. LEXIS 79520 at *8-9.  Plaintiffs respectfully contend, based in part on the Court's misapprehension of the jurisdictional evidence, that *White* is wrongly decided.

[37]    Heslop Dep. at 33, 135 (Ex. 5).

[38]    *Id.* at 89-90 (Ex. 5); Corrigan Dep. at 44-45, 47 (majority of Franklin Plaza, Philadelphia employees work for GSK LLC) (Ex. 3).  For example, an application for certificate of authority for a limited liability company filed in West Virginia for GSK LLC was signed by Jan Lyons as "Assistant Treasurer, GlaxoSmithKline Holdings Americas Member."  Heslop Dep. at 118-119 (Ex. 5).

[39]    Heslop Dep. at 112-13 (Ex. 5).  Note that under the Delaware Limited Liability Company Act, as sole member of GSK LLC, GSK Holdings is statutorily entitled to all profits generated by GSK LLC.  6 Del. Code Ann. § 18-503 ("The profits and losses of a limited liability company shall be allocated among the members . . . .")

[40]    Heslop Dep. at 63-64 (Ex. 5).

[41]    Heslop Decl. ¶¶ 17, 22 (Ex. 4); Heslop Dep. at 36-39, 67, 108 (Ex. 5).

[42]    *See* LexisNexis (partial) business search results (listing 1105 N. Market Street Suite 1300, Wilmington, DE 19801, as the headquarters and/or registered offices of the following entities (along with hundreds and hundreds of others), which are entirely unrelated to GSK: Orkin Pest & Termite Control, GE Motor Club, Inc., Bob Evans Restaurants of Michigan, Inc., Tire Distribution Systems, Inc., Cincinnati Apartment Guide, Associated Pipe Line

space or other facilities of its own in Wilmington or elsewhere in Delaware.[43]   GSK Holdings'

only operating expense that its president, Mr. Heslop, is aware of consists of "very small" sums

paid to Wilmington Trust for use of their conference room and secretarial services.  Mr. Heslop

visits the Wilmington Trust building "rarely"—i.e., occasionally (but not always) for GSK

Holdings' board meetings that last approximately 15-20 minutes each.[44]   When Mr. Heslop

travels from London to the United States for GSK Holdings' board meetings, he stays in

Philadelphia, where he conducts all his other GSK-related business on his U.S. trips; his "norm"

is to go from Philadelphia International Airport to Wilmington for the short GSK Holdings board

meeting, then later the same day travels back to center city Philadelphia for the remainder of his

stay in the region.[45]   Mr. Heslop travels to Wilmington for no other reason than occasionally for

GSK Holdings' board meetings.[46]   Mr. Corrigan testified that he attends only about 50 percent of

GSK Holdings' board meetings in Wilmington.[47]   He spends approximately two to three hours

reviewing financial statements and other documents in advance of each quarterly, 15-20 minute

board meeting; all of that preparation takes place outside of Delaware.[48]   Mr. Heslop confirmed

that all the work in advance of the quarterly GSK Holdings board meetings is done outside

---

Contractors, Inc., Toyo Ink International Corp., Recticel Foam Corporation, Polymer Enterprises Corp., Bentley Software Inc., Infinity Construction Holding, LLC, CB Delaware Investments Inc., Rubber Technology, Inc., John Hancock International Holdings Inc., Possum Point Inc., Chubb GP LLC, Big Flower Digital LLC, Pelican Mortgage Company, Inc., DuPont Photomasks Inc., Total Investments USA Inc., USAA Acceptance II LLC, Executive Jet Group 1 LLC, Galt Power Inc., Paul Singer Family Foundation, First Horizon Mortgage Loan Corporation, Fruehauf Corporation, and Duquesne Power LP) (Ex. 13).

[43]   The lease summary produced by GSK revealed no leased space in the Wilmington Trust building or anywhere else in Delaware (*see* Ex. 14), notwithstanding Mr. Heslop's testimony that "if [GSK Holdings] had any" leased space in Wilmington, Delaware, "it would be immaterial."  Heslop Dep. at 33 (Ex. 5); *see id.* at 36, 38-39, 108-109 (Ex. 5).

[44]   *Id.* at 35, 73, 90-91, 108 (Ex. 5).

[45]   *Id.* at 41, 111 (Ex. 5).

[46]   *Id.* at 123 (Ex. 5).

[47]   Corrigan Dep. at 24 (Ex. 3).

[48]   *Id.* at 65-66 (Ex. 3).

Delaware.[49]  And, according to GSK Holdings' bylaws, the "general office" of GSK Holdings

and all its "books and papers thereto belonging shall be at Philadelphia, Pennsylvania."[50]

Furthermore, although GSK claims GSK Holdings is only a holding company—an owner

of other companies—as opposed to an "operations" company—numerous documents GSK

produced raise questions concerning the veracity of GSK's position.  In particular, documents

produced by GSK in discovery reveal that GSK Holdings frequently contracts with the federal

government out of GSK LLC's Philadelphia headquarters to supply millions of dollars of

antivirus and other drugs to the government.[51]  Those contracts do not originate in Delaware;[52]

indeed, the contractor is listed as GSK Holdings at "One Franklin Plaza, Philadelphia,

Pennsylvania," together with SmithKlineBeecham Corporation (i.e., GSK),[53] and the contracting

agents are, according to Mr. Corrigan, most likely GSK LLC employees.[54]  According to Mr.

Corrigan, invoicing for those contracts would be performed in Philadelphia at GSK LLC's

---

[49]     Heslop Dep. at 91 (Ex. 5).

[50]     *Id.* at 203 (Ex. 5); *see* Bylaws of GSK Holdings (Ex. 15, PAR004634281-83; PAR004634635-44).  GSK Holdings has—after Mr. Heslop's deposition—amended its bylaws to change the location of the corporate books and records.  (*See* discussion, *infra* at 11-12.)  However, even *after* that amendment to the bylaws, Mr. Corrigan testified that the financial records for GSK Holdings are stored in London.  Corrigan Dep. at 39 (Ex. 3).

[51]     *See, e.g.*, Solicitation/Contract/Order for Commercial Item between the United States Health and Human Services Department and the "Contractor" GSK Holdings for "Antiviral treatment courses," valued at $130 million and signed by Desmond McCaffery, a Contract Manager on GSK Holdings' behalf on September 30, 2009—after the formation of GSK LLC (Bates PAR004634404-PAR004634417, attached as Ex. 16).  With respect to this contract/award, Mr. Corrigan testified that Mr. McCaffery works for the "contracting" department at GSK LLC's headquarters at Franklin Plaza in Philadelphia.  (Corrigan Dep. at 86-88 (Ex. 3).)  Mr. Corrigan testified that similar contracts (Bates PAR004634571-PAR004634587, Ex. 17; and Bates PAR004634588-PAR004634612, Ex. 18) were not originated in Delaware and the contracting agents were, most likely, GSK LLC employees.  (*See* n.48, *infra* at 10.)  *See also* Solicitation/Contract/Order for Commercial Item between the United States Health and Human Services Department and the "Contractor" GSK Holdings for "Antiviral drugs for the HHS critical work force," (Ex. 19, PAR004635000-PAR004635013); Solicitation/Contract/Order for Commercial Item between the United States Health and Human Services Department and the "Contractor" GSK Holdings for "Antiviral drugs for the HHS critical workforce," also signed by Desmond McCaffery as Contract Analytics Manager on GSK Holdings' behalf on September 30, 2009 (Ex. 20, PAR004634418-PAR004634430).

[52]     Corrigan Dep. at 75-76 (Ex. 3).

[53]     *Id.* at 78-79, 85-88 (Ex. 3); *see* n. 46, *supra* at 10.

[54]     Corrigan Dep. at 82-85 (Ex. 3).

headquarters.[55]  Plainly, GSK Holdings held itself out to the federal government and others that GSK Holdings was a Pennsylvania-headquartered corporation.[56]  As GSK Holdings, Inc. is indisputably a "*corporate* citizen" for purposes of diversity jurisdiction, *Hertz* applies to determine the location of its domicile and citizenship.  Applying the "nerve center" test established in *Hertz* to the facts surrounding GSK Holdings, Inc. clearly reveals that it is, in fact, a corporation whose true "nerve center" is in Philadelphia, Pennsylvania, destroying diversity in this action.  At a minimum, the Court should find that GSK has failed to satisfy its burden to show that GSK Holdings, Inc.'s nerve center is in Delaware, and remand these cases.

### GSK's Jurisdictional Machinations in These Cases Fail to Establish Jurisdiction.

Recently, Judge Savage allowed Plaintiffs in a consolidated remand, limited jurisdictional discovery to uncover evidence relating to GSK's nascent claim of Delaware citizenship.[57]  GSK initially offered Mr. Heslop as its Rule 30(b)(6) witness to testify as to the relevant jurisdictional facts.  At GSK's request, Plaintiffs' counsel traveled to London to accommodate the witness. Several days after the conclusion of that deposition and just days before the court imposed discovery deadline, GSK noticed the deposition of Mr. Corrigan, suggesting that Mr. Heslop was not in fact the appropriate 30(b) (6) designee.[58]  During a hearing on Plaintiffs' Motion for Protective Order, GSK changed its tune once again, stating that Mr. Heslop *was* a proper 30(b)

---

[55]     *See, e.g., id.* at 74, 88 (Ex. 3).
[56]     See contracts as early as January 12, 2007 through April 1, 2010 between GSK Holdings (or SKB using GSK Holdings Dunn and Bradstreet Identification Number 1342). All of these contracts and responses to Requests for Proposals utilize Philadelphia, Pennsylvania. (Ex. 21) But, compare with Heslop's affidavit, it suggests GSK Holdings was operating out of Delaware since 1999. (Ex. 4)

[57]     Judge Savage consolidated seven GSK cases for purposes of Remand and allowed discovery on those issues referenced herein.  *Ruttinger v. SKB Corp.d/b/a GSK, CA No. 10-4445; Brewer v. SKB Corp. d/b/a GSK, CA No. 10-4443; Dean v. SKB Corp.d/b/a GSK, CA No. 10-4444; Lewis v. SKB Corp.d/b/a GSK, CA No. 10-4446; Moore v. SKB Corp.d/b/a GSK, CA No. 10-4447; H. Cotes v. SKB Corp.d/b/a GSK, CA No. 10-5198; K. Cotes v. SKB Corp.d/b/a GSK, CA No. 10-5199*
[58]     GSK's deposition notice of Michael Corrigan (Ex. 22).

(6) witness, but that Mr. Corrigan would provide information that was unknown to Mr. Heslop.[59] Following the Court's admonishment that Mr. Corrigan's testimony should not contradict the testimony provided by Mr. Heslop,[60] the deposition of Mr. Corrigan proceeded.  Consistent with their Motion for Protective Order and arguments before this Court, Plaintiffs maintain that Mr. Heslop was a proper 30(b) (6) witness to provide the facts relevant to this issue.

Apparently dissatisfied with Mr. Corrigan's testimony and despite the fact that jurisdictional discovery was closed under this Court's original schedule, GSK then surprised Plaintiffs and the *Ruttinger* Court with the declaration of Wilmington Trust manager and vice-president Donald McLamb attached to an unsolicited "Reply" to Plaintiffs' Remand Memorandum.  The Court rightfully permitted Plaintiffs to depose Mr. McLamb.

Like that of Messrs. Heslop and Corrigan, Mr. McLamb's testimony only reconfirms Plaintiffs' position from  the beginning: GSK Holdings, Inc.' principal place of business cannot be Delaware under *Hertz*, and GSK repeatedly fails to meet its burden to show otherwise, despite ample opportunities to do so afforded by this Court.  Indeed, it is again abundantly clear that **GSK Holdings, Inc.' Delaware "presence" is nothing more than a formality**, which *Hertz* proscribes as a basis for jurisdiction.

A question before the Court is whether GSK satisfies—absent any doubts that must be resolved in favor of remand—its burden of persuasion to show that GSK Holdings, Inc. is completely diverse from the Plaintiffs.  *Hertz Corp.* v. *Friend,* 130 S. Ct. 1181, 1194 (2010); *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 851 (3d Cir. 1992).  **GSK has not satisfied that burden**, as set forth below and in Plaintiffs' Remand Memorandum.

---

[59]     Hr'g Tr. (Nov. 2, 2010) at 9-11 (Ex. 23).
[60]     *Id.* at 13 (Ex. 23).

12

*Hertz* prohibits corporate citizenship findings premised merely on the location of "**mail drop box[es]**," "**bare offices with a computer**," or similar artifices. 130 S. Ct. at 1195. The testimony of Mr. McLamb unequivocally establishes that GSK Holdings, Inc. has no real "headquarters"—as the Supreme Court employs that term in *Hertz*—located in Delaware:

> GSK Holdings, Inc.' mail is received and handled at Wilmington Trust by a Wilmington Trust administrative assistant, not a GSK Holdings, Inc. employee. (Deposition of Donald McLamb ("McLamb Dep.") at 47, Exhibit 24.) Wilmington Trust employees then categorize the mail, and critical categories of mail such as legal and tax-related documents are then packaged and forwarded to GSK LLC's headquarters at One Franklin Plaza in Philadelphia.[61] Similar mail forwarding service is provided by the same Wilmington Trust employees for approximately 200 other holding companies like GSK Holdings, Inc. (McLamb Dep. at 45-46 (Ex. 24).)
>
> The office space that GSK Holdings, Inc. and two other GSK-related entities jointly sublet from Wilmington Trust at 1105 N. Market Street room 622 consists of one 10-foot by 10-foot room containing file cabinets, a desk, and a computer. (McLamb Dep. at 19, 62 (Ex. 24).) ***No one works in that "office" on a daily basis.*** (*Id.* at 19 (Ex. 24).) Mr. McLamb testified that he did not know if the computer in room 622 was plugged in. (*Id.* at 52 (Ex. 24).) Phone calls for GSK Holdings, Inc. are answered by Wilmington Trust telephone operators located seven floors above suite 622—on Wilmington Trust's "main floor." (*Id.* at 50-51, 58 (Ex. 24).)
>
> As a director and officer of GSK Holdings, Inc., Mr. McLamb expends a grand total of ***four hours per year*** preparing for and participating in GSK Holdings, Inc.' board meetings. (*Id.* at 35 (Ex. 24).) The board meetings typically last about 30 minutes each. (*Id.* (Ex. 24).) He estimates he spends an hour per month performing secretarial duties on GSK Holdings, Inc.' behalf. (*Id.* at 32 (Ex. 24).) Tellingly, Mr. McLamb admitted that "quarterly meetings are enough to operate and properly manage the assets of the holding company" because "actions that we, the board, have made *can be* ***approved and handled by others during the regular quarter***." (*Id.* at 130-31 (Ex. 24).) In addition to his position as a GSK Holdings, Inc. officer and director, Mr. McLamb manages similar services provided to approximately 200 other unrelated holding companies, and provides tax preparation services for approximately

---

[61]     Following Mr. McLamb's deposition, GSK attorney Mr. Joseph E. O'Neil confirmed on GSK's behalf that all mail relating to the categories of (1) "legal documents served on GSK," (2) "publications," and (3) "tax documents (other than franchise or payroll taxes)" are forwarded to One Franklin Plaza (GSK LLC's headquarters) in Philadelphia. (*See* Ltr. from Mr. O'Neil (Dec. 16, 2010), Exhibit 25). Only checks requiring a second signature are forwarded to GSK in the United Kingdom. (*Id.*) Some other correspondence—e.g., that pertaining to the "bill paying" services provided by Wilmington Trust (Ex. 24, McLamb Dep. at 18) such as bank statements and bills received—are directly handled in Wilmington by Wilmington Trust employees. (But, the extent of authorization to pay such bills from the Delaware Citibank account is limited to $2500. (McLamb Dep. at 134 (Ex. 24).)

250 additional (not overlapping) companies. (*Id.* at 11-12 (Ex. 24).)  Mr. McLamb is not a GSK Holdings, Inc. employee. (*Id.* at 57 (Ex. 24).)

Wilmington Trust employee Elizabeth Bothner[62] spends about 20 hours annually in her duties as assistant secretary for GSK Holdings, Inc. (*Id.* at 35 (Ex. 24).)  GSK Holdings, Inc. has no full-time employees. (*Id.* at 134 (Ex. 24).)

Proposed board meeting agendas are forwarded to Delaware from Philadelphia. (McLamb Dep. at 100-103 (Ex. 24; *see* Ltr. from Mr. O'Neil (Dec. 16, 2010) (Ex. 25).)  The document attached hereto as Exhibit 26 is a "typical" pre-board meeting packet received from Philadelphia in advance of GSK Holdings, Inc. board meetings, according to Mr. McLamb. (McLamb Dep. at 108-109 (Ex. 24).)  McLamb, like the two other directors, Messrs. Heslop and Corrigan, has never voted against the recommendations contained in the agenda that is forwarded to Wilmington from GSK LLC's headquarters in Philadelphia. (McLamb Dep. 107-108, 140-41 (Ex. 24).)  Effectively, therefore, all material decisions that the board "ratifies" have already been made and come from the Philadelphia office. (*See id.*)

The check register produced by GSK Holdings, Inc. for the checking account from which the corporation's bills are paid by Wilmington Trust showed a balance of $24.38 as of November 19, 2010, just prior to Mr. McLamb's deposition. (*Id.* at 73 (Ex. 24).)  Mr. McLamb's authority to release funds from that Delaware checking account is limited to $2500. (*Id.* at 134 (Ex. 24).)

As was the case with Messrs. Heslop's and Corrigan's testimony, Mr. McLamb's testimony confirms that GSK Holdings, Inc.'s alleged Delaware "headquarters" is nonexistent, despite GSK's repeated declarations and proffered testimony attempting to convince the court otherwise.  GSK first offered the Heslop Declaration in opposition to the motion to remand in the *White* case,[63] and successfully defeated remand on the basis of that evidence alone.  However, the discovery permitted by this Court reveals the superficial nature of GSK's jurisdictional contentions:

---

[62]    Mr. McLamb testified that Ms. Bothner receives a W-2 form from GSK Holdings, Inc., presumably for her work as assistant secretary. (McLamb Dep. at 57 (Ex. 24).)

[63]    *White* v. *SmithKline Beecham Corp.,* No. 10-2141, 2010 U.S. Dist. LEXIS 79520, at *3-7 (E.D. Pa. Aug. 6, 2010).

| **GSK's Jurisdictional "Proof"** | **Discovery Reveals** |
|---|---|
| A. "GSK Holdings is a Delaware corporation with its headquarters and principal place of business in Delaware." (Heslop Decl. ¶ 13, Ex. 4.) | ➤ ***GSK Holdings, Inc. has "zero" employees in Delaware*** (Heslop Dep. at 33, 135, Ex. 5), or at least no full-time employees (McLamb Dep. at 134, Ex. 24); *see* n.2, *supra*). |
| | ➤ According to GSK Holdings, Inc.'s by-laws that were in force at the time Plaintiffs' cases were filed, the ***"general office" of GSK Holdings, Inc. and all its "books and papers thereto belonging shall be at Philadelphia, Pennsylvania."*** (Ex. 15) |
| | ➤ Two of the only three GSK Holdings, Inc. officers who are also full-time GSK employees have their full-time, permanent offices in Philadelphia. (Corrigan Dep. at 42, Ex. 3; Heslop Decl. ¶ 21, Ex. 4; Heslop Dep. at 26-27, 63-65, Ex. 5). None of those GSK Holdings, Inc. officers nor the majority of the directors have full-time, permanent offices in Delaware, nor could even be said to office in Delaware part-time. (Heslop Dep. at 24-25, Ex. 5). |
| B. "[GSK Holdings, Inc.] pays taxes, and it has litigated over its rights and obligations." (Heslop Decl. ¶ 15, Ex. 4). | ➤ GSK Holdings, Inc.'s U.S. tax returns are prepared by its assistant treasurer and GSK LLC's U.S. tax director Jan Lyons and her "big team" of 20-25 GSK LLC employees officing in Philadelphia. (Heslop Dep. at 26-27, 63-65, Ex. 5). |
| | ➤ Documents relating to legal and tax matters mailed to GSK Holdings, Inc. in Delaware are forwarded to GSK LLC in Philadelphia. (*See* discussion, *supra* at 15 & n. 61.) |

15

| **GSK's Jurisdictional "Proof"** | **Discovery Reveals** |
|---|---|
| C. "While many of the actions in furtherance of its business are conducted outside of Delaware, particularly in London, the formal control over and approval of significant decisions regarding these actions are made or ratified by its officers and directors in Delaware, at meetings conducted in Wilmington, Delaware." (Heslop Decl. ¶ 15, Ex. 4). "At the quarterly meetings, the Board of Directors reviews and approves the corporate accounts, and reviews, controls and ratifies the key business activities of GSK Holdings." (Heslop Decl. ¶ 22, Ex. 4). | ➢ ***Most of the representatives authorized to act on GSK Holdings, Inc.'s behalf are GSK LLC employees working in Philadelphia.*** (Heslop Dep. At 89-90, Ex. 5; Corrigan Dep. 44-45, 47, Ex. 3). As noted, Mr. McLamb testified that the GSK Holdings, Inc. board of directors needs to meet only four times per year for a collective ***annual total of two hours*** because actions authorized by the board "can be approved and handled by others during the regular quarter." (McLamb Dep. at 130-31, Ex. 24).<br><br>➢ Proposed agendas for actions to be taken by the board are forwarded to Wilmington from GSK LLC's Philadelphia office, and none of the three board members have ever voted against proposed action items contained on the agenda that is created in Philadelphia. (McLamb Dep. at 100-103, 107-109, 140-41, Ex. 24) |
| D. "GSK Holdings, Inc. identifies 1105 North Market Street, Suite 1300, Wilmington, Delaware 19801, in the offices of Wilmington Trust, as its registered office in documents filed with the Delaware Secretary of State." (Heslop Decl. ¶ 17, Ex. 4). | ➢ The 13th floor of 1105 North Market Street in Wilmington, Delaware is the "main floor" of Wilmington Trust SP Services. (McLamb Dep. at 58, Ex. 24).<br><br>➢ In his deposition, when shown a picture of the Wilmington, Delaware building that is supposedly GSK Holdings, Inc.'s "headquarters," Mr. Heslop did not recognize the building. (Heslop Dep. at 35, Ex. 5). |

| **GSK's Jurisdictional "Proof"** | **Discovery Reveals** |
|---|---|
| E.  "GSK Holdings' address will be identified as 1105 North Market Street, Suite 622, Wilmington, Delaware 19801 in the federal tax filing for taxable year 2009, which will be filed later in 2010 by GSK Holdings" (*Id.* ¶ 18, Ex. 4). | ➢ As noted, room 622 is a 10 x 10-foot, unattended room with a desk, file cabinets, and computer (which Mr. McLamb could not confirm was "plugged in").  (See discussion, *supra* at 14.)  Phone calls are routed to Wilmington Trust telephone operators on Wilmington Trust's "main floor."  (*Id.*)<br><br>➢ A lease summary produced by GSK showed no lease space in Delaware at all, and Mr. Heslop testified that any space GSK Holdings, Inc. had in Delaware "would be immaterial."  (*Supra* at 109 & n.42.)  Mr. McLamb testified that GSK Holdings, Inc. sublets room 622 together with two other GSK-related entities for approximately $331 per month.  (McLamb dep. at 19, 62, 77-78, Ex. 24). |
| F.  "GSK Holdings, Inc.' activities are controlled and coordinated through the actions and decisions of its officers and directors.  Being a holding company, those activities are relatively few and managed primarily through review and ratification of financial accounts."  (*Id.* ¶ 19, Ex. 4). | ➢ GSK Holdings, Inc. frequently contracts with the federal government out of GSK LLC's Philadelphia headquarters to supply millions of dollars of antivirus and other drugs to the government.  Those contracts do not originate in Delaware; indeed, the contractor is listed as GSK Holdings, Inc. at "One Franklin Plaza, Philadelphia, Pennsylvania," together with SmithKlineBeecham Corporation (i.e., GSK) and the contracting agents are, according to Mr. Corrigan, most likely GSK LLC employees.  (*Supra* at 11, n.50) |

| **GSK's Jurisdictional "Proof"** | **Discovery Reveals** |
|---|---|
| G. "GSK Holdings, Inc.' Board of Directors holds quarterly meetings in Delaware, usually at 1105 North Market Street, Suite 1300, Wilmington, Delaware." (*Id.* ¶ 22, Ex. 4). | ➢ GSK Holdings, Inc.' board meetings are held in a Wilmington Trust conference room on the 13th floor. (Heslop Dep. at 36-39, 67, 108, Ex. 5).<br><br>➢ ***GSK Holdings, Inc.' quarterly board meetings last 15-20 minutes each.*** The board meets for less than two hours per year. (Heslop Dep. at 35, 73, 90-91, 108, Ex. 5). All of Mr. Heslop's and Mr. Corrigan's preparation for the board meetings takes place outside of Delaware. (Heslop Dep. at 91, Ex. 5); Corrigan Dep. at 65-66, Ex. 3).<br><br>➢ ***Mr. Corrigan testified that he attends only 50 percent of the board meetings in person.*** (Corrigan Dep. at 24, Ex. 3). Mr. Heslop also testified that he does not attend every meeting in person. (Heslop Dep. at 35, 73, 90-91, 108, Ex. 5). |

Ultimately, the Court should find that GSK's "proof" that the parties are completely diverse is simply insufficient. Further, "all doubts" in determining the propriety of removal—to the extent there could be *any* here—"should be resolved in favor of remand." *Batoff*, 977 F.2d at 851. The Court should remand Plaintiffs' cases.

### Under *Hertz* the Court Should Not Prevent Pennsylvania Courts from Redressing Tortious Conduct that Occurred in Pennsylvania.

The Supreme Court plainly recognized that certain businesses would attempt to "manipulate federal-court jurisdiction ... , opening the federal courts' doors in a State where it conducted nearly all its business by filing incorporation papers elsewhere," and as Plaintiffs argued in their Remand Memorandum, that is precisely what will happen here if Plaintiffs' cases

are not remanded. *Hertz*, 130 S. Ct. at 1188. (Supra at 23.) *Hertz*'s explicit policy is that the proponent of federal jurisdiction may not attempt to "subvert[]" the aforementioned "major reason for the insertion of the 'principal place of business' language in the diversity statute." *Hertz*, 130 S. Ct. at 1195.

GSK obviously seeks to prevent Pennsylvania's court system—which has undertaken hundreds of similar cases—from redressing Plaintiffs' claims here. Yet, given GSK's extensive conduct occurring in Pennsylvania and directly supporting Plaintiffs' claims, GSK should not be permitted to escape the Pennsylvania courts' jurisdiction by erecting formalistic barriers through *ex post facto* business entity creation and manipulation. No one can dispute that Pennsylvania has a right to deter tortious conduct within its borders. *Arcila v. Christopher Trucking,* 195 F.Supp. 2d 690 (E.D. Pa. 2002). *See also, Fleet Nat. Bank v. Boyle,* 04-CV-1277-LDD, 2005 WL 2455673 (E.D. Pa. Sept. 12, 2005). To allow GSK to avail itself of the benefits and services of the Commonwealth but not subject it to the accompanying laws and discipline will effect an unjust result.

Lastly, in perhaps the ultimate demonstration of GSK's attempts to manipulate jurisdiction in Pennsylvania  cases, it has now, after  multiple suits were filed related to its various products, undertaken to amend GSK Holdings' bylaws (following Mr. Heslop's deposition) to further attempt to create the (false) impression of a Delaware "nerve center" that will satisfy *Hertz*.[64] Specifically, the bylaws now state that the general office and books and records of GSK Holdings are located in Wilmington, Delaware.[65] GSK also wrote to the federal government requesting that the aforementioned contracts and solicitations be corrected to

---

[64]        By-Laws of GSK Holdings (as am. Oct. 29, 2010) § 1.1 (Ex. 15).
[65]        *Id.* (Ex. 15).

remove GSK Holdings as a contracting party.[66]   The Court should not be swayed by GSK's eleventh-hour jurisdictional maneuvering.[67]

## ARGUMENT & AUTHORITIES

### Standard

The Court must strictly construe the removal statute against removal so that the Congressional intent to restrict federal diversity jurisdiction is honored.  *Samuel-Bassett v. Kia Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004); *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990).  This policy has always been rigorously enforced by the courts.  *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938).  "The burden of persuasion for establishing diversity jurisdiction . . . remains on the party asserting it."  *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1194 (2010).  "[A]ll doubts" in determining the propriety of removal "should be resolved in favor of remand."  *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 (3d Cir. 1992). "[T]he district court must 'focus on the plaintiff's complaint at the time the petition for removal was filed.  In so ruling, the district court must assume as true all factual allegations of the complaint.'"  *Id.* at 851-52 (quoting *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987)).  "It also must 'resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff.'"  *Batoff*, 977 F.2d at 852 (quoting *Steel Valley Auth.*, 809 F.2d at 1010)).

### Removal Is Improper Because Complete Diversity of Citizenship Is Lacking.

Although GSK asserts in its notice that removal is proper because complete diversity of citizenship exists, that is not the case.  The principal place of business—the "nerve center"—of

---

[66]     GSK Correspondence (Ex. 27).
[67]     Of course, "[i]t is a firmly established rule that subject matter jurisdiction is tested as of the time of the filing of the complaint."  *Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 392 n.13 (3d Cir. 1991) (citing cases).

both GSK LLC and GSK Holdings is the same location that GSK's admitted principal place of business always was—center city Philadelphia, Pennsylvania.  Further, as of the date of filing, GSK was still listed as an active corporation in Pennsylvania. Despite this active status, GSK is still subject to suit in Pennsylvania for two years following its dissolution, a fact that also destroys complete diversity. Therefore, under relevant case law and 28 U.S.C. § 1441(b), these actions are not removable as GSK, one of the parties in interest properly joined and served, "is a citizen of the State in which [these] actions [were] brought."  For those reasons, as discussed in detail below, this Court should remand the case to the Court of Common Pleas in Philadelphia.

**The Court Should Find that GSK LLC's Principal Place of Business for Purposes of Diversity Jurisdiction Is In Philadelphia, Pennsylvania.**

Earlier this year, the United States Supreme Court established the "nerve center" test as the proper test for determining a business entity's "principal place of business" for purposes of federal diversity jurisdiction under 28 U.S.C. § 1332(c)(1).  *Hertz*, 130 S. Ct. at 1185-86.  The Court concluded that the phrase "principal place of business" refers to the place where the "high level officers direct, control, and coordinate the corporation's activities."  *Id.* at 1186.  The High Court held that the principal place of business "should normally be" the location of the company's "headquarters – provided that the headquarters is the *actual center* of direction, control, and coordination, *i.e.*, the 'nerve center,' and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)."  *Id.* at 1192 (emphasis added).  The Supreme Court in *Hertz* instructed lower courts to identify, if possible, the "brain" of the organization, urging that its "nerve center" test "point's courts in a single direction, towards the center of overall direction, control, and coordination."

21

It is without question that the situs of GSK LLC's "brain," headquarters, and principal place of business is in Philadelphia, as GSK Holdings' president admitted in sworn testimony. (Heslop Dep. at 107 (Ex. 5); *see* discussion, *supra* at 3-13.)

Notwithstanding the undisputed jurisdictional facts above concerning GSK LLC's principal place of business, GSK asserts that the Court should not apply the Supreme Court's "nerve center" test because GSK LLC is an LLC and not a corporation.  (*See* GSK LLC's Am. Mem. Opp'n to Pls.' Mot. Remand in *Monroe v. SmithKlineBeecham Corp.*, No. 2:10-cv-02140-JCJ, at 6-9 (attached as Ex. 28).)  According to GSK, the Court need only look to the "citizenship of [GSK LLC's] member []," relying on *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010).

But *Zambelli* is off point.  The location of one of the members of the LLC defendant in the case was non-diverse to the plaintiff, so the United States Court of Appeals for the Third Circuit ("Third Circuit") found diversity jurisdiction lacking on that basis alone.  *Id.* at 420. Thus, neither party raised, nor was the Third Circuit obliged to consider, the issue of whether the "nerve center" test *might also apply* to an LLC for purposes of defeating diversity jurisdiction. Indeed, Plaintiff would agree with *Zambelli* that—in the instance that an LLC's member is non-diverse—diversity jurisdiction is lacking.  But, that is not the situation here and not where this Court's analysis should end.  *Zambelli* does *not* stand for the proposition that the Court should not also look to other relevant jurisdictional facts.

In the situation where, as here, GSK manipulated its business structure effectively to avoid liability in Pennsylvania state court, while maintaining the headquarters of its United States pharmaceutical operations in Pennsylvania, GSK cannot articulate any logical rationale for avoiding the principal place of business/"nerve center" test.  As Justice Breyer and the Supreme

22

Court majority recognized, it is expected that some business entities will attempt to "manipulate federal-court jurisdiction . . . , opening the federal courts' doors in a State where it conducted nearly all its business by filing incorporation papers elsewhere." *Hertz*, 130 S. Ct. at 1188. **That is precisely what GSK has done here.** While continuing to direct, control, and coordinate its relevant United States operations from center city Philadelphia *just as GSK did at all times material to Plaintiffs' lawsuits*, GSK formally "converted" itself into a Delaware LLC by filing formation papers in Delaware, establishing as its sole member a Delaware corporation (GSK Holdings), all now presumably safely out of reach of the Pennsylvania state courts wherein GSK always was subject to jurisdiction. Nevertheless, GSK offers no credible eidence that it's "nerve center" of operations in Philadelphia materially changed or is somehow less vital to the direction, control, and coordination of the company in its new LLC form. GSK simply asks the Court to ignore the "nerve center" test on the rationale that the *Brewer* opinion was incorrect and that the *Hertz* opinion addressed only corporations and not LLCs.

Would the Supreme Court limit the *Hertz* opinion under these facts? As noted, the Supreme Court recognized the proclivities of business entities to shelter under the formation laws of one state while directing, controlling, and coordinating its operations from another state, and in light the facts, those circumstances certainly cannot be said to be unique to corporations. *See Hertz*, 130 S. Ct. at 1188. Furthermore, under 28 U.S.C. § 1332(d)(10), Congress determined that jurisdiction for purposes of federal class actions involving "unincorporated associations" such as LLCs takes into account "the State where [the unincorporated association] has its principal place of business," and there is little reason other than statutory construction to restrict such analysis to class actions alone. *See Zambelli*, 592 F. 3d at 420 (reaffirming that an LLC is an "unincorporated association"). Indeed, if the purpose of 28 U.S.C. § 1332 is to

"scrupulously confine" the jurisdiction of the federal courts "to the precise limits which the statute defined," *see Snyder v. Harris*, 394 U.S. 332, 339-40 (1969), then it is not contrary to Congress's purpose for the courts to recognize that LLCs and other unincorporated associations also have readily identifiable "nerve centers" that should be considered to appropriately restricts diversity jurisdiction in federal court.

As noted, it is GSK's burden to prove diversity jurisdiction, and all doubts in that regard and uncertainties in the law must be resolved in favor of remand. *Hertz*, 130 S. Ct. at 1194; *Batoff*, 977 F.2d at 851. GSK fails to meet that burden.

> **GSK Failed to Prove that the "Nerve Center" of GSK LLC's Sole Member, GSK Holdings, Is in Delaware, Not Pennsylvania, Mandating Remand of the Case.**

Regardless of whether the Court agrees that GSK LLC's "nerve center" is in Philadelphia, GSK cannot overcome *Hertz*'s admonition that a principal place of business *cannot be* "simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." 130 S. Ct. at 1192. Shown above, this is precisely that circumstance. Apparently GSK Holdings exists only on paper in Delaware for 352 days a year; the other four days consist of 15-20 minute meetings each day during which financial statements are "reviewed" and effectively rubberstamped. (*See* discussion, *supra* at 8-11.) Meanwhile, hundreds if not thousands of other unrelated business entities share precisely the same business address and suite number as GSK Holdings, rendering GSK Holdings' supposed Delaware "headquarters" nothing more than its registered address and effective mail drop in Delaware. (*See* discussion, *supra* at 10-11 & n.15.)

The Supreme Court in *Hertz* proscribed attempts to designate, for example, a "mail drop box" as the "nerve center" of a corporation's activities, calling it "jurisdictional manipulation."

130 S. Ct. at 1195.  To illustrate, the High Court rejected the suggestion that the mere filing of a

form like the Securities and Exchange Commission's Form 10-K listing a corporation's

"principal executive offices" "would, without more, be proof to establish a corporation's 'nerve

center.'"  *Id.*  "Such possibilities would readily permit jurisdictional manipulation, ***thereby***

***subverting a major reason for the insertion of the 'principal place of business' language in the***

***diversity statute***."  *Id.* (emphasis added).  The Court concluded unequivocally that:

> Indeed, if the record reveals attempts at manipulation – for
> example, that the alleged "nerve center" is ***nothing more than a***
> ***mail drop box***, a bare office with a computer, or the location of an
> annual executive retreat – ***the courts should instead take as the***
> ***"nerve center" the place of actual direction, control, and***
> ***coordination, in the absence of such manipulation***.

*Id.* (emphasis added).

Instead of accepting GSK's self-serving declaration and related testimony and arguments

at face value and ignoring the obvious—even if unintended—"jurisdictional manipulation" at

play here, the Court should recognize what Plaintiffs have already demonstrated above—i.e., that

the day-to-day "nerve center" business activities of GSK Holdings takes place not in Delaware,

but at the headquarters of GSK LLC at One Franklin Plaza in Philadelphia.

And, notwithstanding GSK's arguments that the Court should not look beyond the

activities of GSK Holdings, as the sole member of GSK LLC, to determine its principal place of

business, there is ample precedent in this district for doing so.  In *Monroe v. SmithKlineBeecham*

*Corporation*, the Eastern District addressed the precise issue that is the subject of this Motion to

Remand.  The Court, giving short shrift to GSK's contention that GSK Holdings' "nerve center"

existed in Delaware, unwaveringly determined that "[alt]hough GlaxoSmithKline, LLC is

officially organized in the State of Delaware, Pennsylvania continues to be the organization's

principal place of business, with Philadelphia as its "'nerve center.'" 2010 U.S. Dist. LEXIS 63626, at *6-8. The Court relied upon a limited subset of the very same jurisdictional facts now presented in Plaintiffs' cases to determine that the Monroes' case must be remanded to state court. *Id.* [68]

Further, in *Douglas v. Ryder Truck Lines, Inc.*, this Court relied on the Third Circuit's opinion in *Kelley v. United States Steel Corp.*, which applied a "center of corporate activity" test that dovetails, in relevant aspects, the Supreme Court's *Hertz* "nerve center" test. *Douglas*, 597 F. Supp. 1100, 1101-1102 (E.D. Pa. 1984). *Compare Kelley*, 284 F.2d 850 (3d Cir. 1960) (focusing on the "headquarters of day-to-day corporate activity and management," and rejecting the location of "the occasional meeting of policy-making Directors" as the principal place of business), *with Hertz*, 130 S. Ct. at 1193, 1194 (holding that "a corporation's "nerve center[]" [is] usually its main headquarters," is often the location the public considers to be "the corporation's main place of business," and is "the *actual center* of direction, control, and coordination" of "business activities" by the corporation's "top officers") (emphasis added), *and United States Fidelity & Guaranty Co. v. DiMassa*, 561 F. Supp. 348, 351 (E.D. Pa. 1983) (following *Kelley*'s "headquarters of day-to-day corporate activity and management" rubric), *aff'd* 734 F.2d 3 (3d Cir. 1984).[69] *Douglas* involved an automobile accident lawsuit against I.U.

---

[68]    The Court subsequently vacated its remand order in *Monroe*, finding upon reconsideration of plaintiff's motion to remand that it had been filed untimely. No. 2:10-cv-02140-JCJ, slip op. at 1-2.

[69]    Ironically, the Third Circuit in *Kelley* rejected the moniker "nerve center" for its adopted test, stating simply that it did "not find the figure of speech helpful." 284 F.2d at 853. "Dorland's Medical Dictionary tells us that a nerve center is 'any group of cells of gray nerve substance having a common function.'" *Id.* Based on that medical definition of "nerve center" *alone*, the Third Circuit rejected what it otherwise deemed a "pleasant and alluring figure of speech." *Id.* In determining diversity jurisdiction over defendant United States Steel Corporation in that case, the court merely stated that "[w]e think there will be, in the case of United States Steel Corporation, a good many nerve cells serving the common function of making the corporate enterprise go." Notwithstanding the courts' differences over the meaning attributable to the phrase "nerve center," the Third Circuit's and United States Supreme Court's tests for determining a corporation's principal place of business are strikingly similar, as shown above.

International, Inc. ("I.U.") and I.U. Management Corporation ("Management Corporation"), an I.U. subsidiary. 597 F. Supp. at 1100-1101. All Plaintiffs were Pennsylvania citizens. *Id.* at 1101. The Court found that I.U. was a holding company, and determined generally that a "holding company conducts very few day-to-day activities" itself. *Id.* The Court also found that although I.U.'s board of directors made "broad policy decisions," it was Management Corporation that "controlled" the "day-to-day management" of I.U.'s activities, and since Management Corporation was headquartered in Philadelphia, diversity jurisdiction was destroyed. *Id.* at 1101-1102. Importantly, this Court specifically held that "[t]he fact that Management Corporation is a legal entity separate from I.U. does not preclude the location of Management Corporation from also being the location of I.U.'s principal place of business." *Id.* at 1101. The Court added:

> As *Kelley* instructs, in determining where the principal place of business is located, courts must look to the place where day-to-day corporate management is located. * * * [The Court's] finding does not disregard Management Corporation's separate corporate status but, rather, only recognizes that this separate entity is the instrumentality through which I.U.'s broad policy decisions are carried out. The location of the instrumentality, Philadelphia, Pennsylvania, is the location of the principal place of business of defendant I.U.

*Id.* at 1101-1102.

Again, in *Bonar, Inc. v. Schottland*, the Eastern District recognized that "[a] corporation's principal place of business exists where the center of corporate activities exists or where the center of gravity of the corporate functions exists, rather than where an occasional meeting of directors takes place." 631 F. Supp. 990, 993-94 (E.D. Pa. 1986). Defendant ABPI-Delaware, Inc. contended that its principal place of business was at 1600 Pennsylvania Avenue in Wilmington, Delaware. *Id.* at 994. The defendant's "corporate documents" listed that address as

27

the corporation's principal place of business where some board of directors meetings took place

*Id.*  But, based on jurisdictional facts paralleling those described herein the Court rejected ABPI-

Delaware, Inc.'s borrowed "business mailing address" as constituting a principal place of

business:

> As to the 1600 Pennsylvania Ave., Wilmington, Delaware address referenced in certain corporate documents, the evidence clearly suggests that this is not the office of ABPI-Del., but, in fact, is the office of Landsburg, Platt, Greenwald, Flax & Nieto, an independent accounting firm.  While it is true some ABPI-Del. corporate activity takes place at this address, such as some meetings of the board of directors, the office is not the exclusive office of ABPI-Del.  ABPI-Del. owns no property nor has any permanent or part-time employees in this office.  In reality, 1600 Pennsylvania Ave. is an accounting firm's office manned by accountants and their employees which ABPI-Del. apparently has permission to use simply as a business mailing address.  While the use of this address undoubtedly serves the legitimate ABPI-Del. business purposes of being the place where mail is received, it is not ABPI-Del.'s principal place of business.

*Id.*

Thus, at an absolute minimum, GSK failed to prove that GSK Holdings' "nerve center"

and principal place of business are in Delaware.  GSK Holdings does not have "corporate

headquarters" in Delaware, but instead has a borrowed business mailing address and borrowed

(rented for a day) conference room within which to conduct some meetings.  It does not have

"top officers" that "direct" the "bulk of [the] company's business activities" from Delaware

because none of GSK Holdings' directors or officers actually work in Delaware—indeed, half of

them hold "day jobs" as executives for GSK LLC in Philadelphia, and most of GSK Holdings'

authorized representatives are GSK LLC employees officing in Philadelphia.  *See Hertz*, 130 S.

Ct. at 1194.  (*See* discussion, *supra* at 4-12.)  Finally, the Court should reject GSK's attempt to

convince the Court that the "nerve center" and headquarters of GSK Holdings, who receives all

of GSK LLC's profits from its United States pharmaceutical operations, consists of a *de facto* mail drop in downtown Wilmington, Delaware.  Under *Hertz*, the court must "instead take as the 'nerve center' the place of *actual* direction, *control*, and *coordination*, in the absence of such manipulation"—here, GSK's headquarters in Philadelphia.  130 S. Ct. at 1195 (emphasis added). Because "[t]he burden of persuasion for establishing diversity jurisdiction" is on GSK, *Hertz*, 130 S. Ct. at 1194, and "all doubts" in determining the propriety of removal "should be resolved in favor of remand," *Batoff*, 977 F.2d at 851, the Court should grant Plaintiff's  motion and remand this case to state court.

**C.**      **Pennsylvania's Survival Statute Requires that GSK Remain Subject to Suit in Pennsylvania After Dissolution, and Therefore Diversity Jurisdiction Is Destroyed.**

In addition, GSK cannot escape the fact that at the time of the removals GSK—although claiming to be a recently dissolved Pennsylvania corporation—remained subject to suit in Pennsylvania, a party to this lawsuit, and a citizen of Pennsylvania for purposes of jurisdiction. The relevant provisions of Pennsylvania's corporations code, titled Survival of remedies and rights after dissolution," state:

> (a) GENERAL RULE. -- The dissolution of a business corporation, either under this subchapter or under Subchapter G (relating to involuntary liquidation and dissolution) or by expiration of its period of duration ***or otherwise***, ***shall not eliminate nor impair any remedy available to or against the corporation*** or its directors, officers or shareholders ***for any right or claim existing, or liability incurred***, prior to the dissolution, if an action or proceeding thereon is brought on behalf of:
>
> (1) the corporation within the time otherwise limited by law; or
>
> (2) any other person before or ***within two years after the date of the dissolution*** or within the time otherwise limited by this subpart or other provision of law, whichever is less. See sections 1987 (relating to proof of claims), 1993 (relating to acceptance or rejection of matured claims) and 1994 (relating to disposition of unmatured claims).

15 Pa. Cons. Stat. Ann. § 1979 (West 2010) (emphasis added); *see, e.g.*, *Atlantic Richfield Co. v. Blosenki*, 847 F. Supp. 1261, 1281-82 (E.D. Pa. 1994) (holding that a dissolved Pennsylvania corporation sued within two years of the corporation's dissolution is a real party in interest in a suit by or against the corporation); *Erdely v. Hinchcliffe & Keener, Inc.*, 875 A.2d 1078, 1083 (Pa. Super. Ct. 2005) ("[Pennsylvania law] extend[s] the corporate life of a dissolved company for a specific period post-dissolution to allow defunct corporations to maintain and defend lawsuits.").

Recently, in response to motions to remand involving another GSK pharmaceutical, GSK argued that when it converted to a Delaware LLC, it was no longer subject to jurisdiction in Pennsylvania.   In three consecutive decisions, three different United States district judges rejected GSK's arguments and remanded the cases to state court. *Aaron v. SmithKline Beecham Corp.*, No. 09-cv1071-JPG, 2010 WL 1752546, at *4-6 (S.D. Ill. Apr. 28, 2010); *Alexander v. SmithKline Beecham Corp.*, No. 09-1072-DRH, 2010 WL 750031, at *4-6 (S.D. Ill. Mar. 3, 2010); *Colon v. SmithKline Beecham Corp.*, No. 09-1073-GPM, 2010 WL 46523, at *4-5 (S.D. Ill. Jan. 5, 2010).   Two of the three courts specifically rejected GSK's argument that it 'didn't *really* dissolve' in the ordinary sense, but merely "domesticated itself" under the laws of Delaware, relying on a 2001 commentary "of somewhat uncertain provenance" that states:

> The effect of filing under this section is not to dissolve the corporation in the ordinary sense but simply to terminate its status as a domestic business corporation.   The existence of the corporation is not affected because the same entity continues to exist in the new jurisdiction of incorporation.

15 Pa. Cons. Stat. Ann. § 1980 cmt. (West 2010); *see Aaron*, 2010 WL 1752546, at *5.  But, as the district court determined in *Aaron*:

> the Pennsylvania Code explains that such comments "may be consulted in the construction or application of the original provisions of the statute if such comments . . . were published or generally available prior to the consideration of the statute by the General Assembly, but the text of the statute shall control in the event of conflict between its text and such comments . . . ."

2010 WL 1752546, at *5 (quoting 1 Pa. Cons. Stat. Ann. § 1939 (West 2010)).  The comments on which GSK relied were published more than ten years after the passage of the portion of the statute in issue; accordingly, the Court should not consider them.  *See Aaron*, 2010 WL 1752546, at *5.  Moreover, the commentary may have carried more weight had GSK maintained its corporate form in Delaware rather than converting to an LLC.  As such, the "existence of the corporation" *was* affected because the same entity *does not* continue to exist in the new jurisdiction.  In short, the Pennsylvania corporation dissolved—it ceased to exist—and the general rule of the Pennsylvania survival statute applies.  15 Pa. Cons. Stat. Ann. § 1979.

**CONCLUSION**

For all the foregoing reasons, the Court should remand this case to the Court of Common

Pleas of Philadelphia County, Pennsylvania.

Respectfully submitted:

Dated:  May 3, 2011                    **FELDMAN & PINTO**

By:  /s/ Rosemary Pinto
Rosemary Pinto, Esquire
Attorney I.D. No. 53114
1604 Locust Street, 2R
Philadelphia, PA 19103
(215) 546-2604 (Phone)
(215) 546-9904 (Fax)
E-mail: rpinto@feldmanpinto.com

**MOTLEY RICE, LLC**
Fred Thompson, III, Esquire
Kimberly D. Barone Baden, Esquire
Adrian W. Broome, Esquire
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843) 216-9265 (Phone)
(843) 216-9450 (Fax)
E-mail: kbarone@motleyrice.com

*Attorneys for Plaintiffs*

32